MICHAEL BAILEY
United States Attorney
District of Arizona
BILL C. SOLOMON
Assistant U.S. Attorney
State Bar No. 020012
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile: (602) 514-7696
E-Mail: William.Solomon@usdoj.gov

*Attorneys for the United States of America*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | Case No. _____ |
|---|---|
| Petitioner, | **PETITION FOR EMERGENCY ORDER TO PERFORM INVOLUNTARY MEDICAL EXAMINATIONS AND ADMINISTER NECESSARY HYDRATION** |
| v. | |
| Eugenii Glushchenko, | |
| Respondent. | |

Petitioner United States of America requests an emergency temporary order permitting the Secretary of the Department of Homeland Security (DHS), through component agencies, Immigration and Customs Enforcement (ICE) and the Public Health Service, Division of Immigration Health Services Corps (IHSC), to perform involuntary medical examinations of Respondent Eugenii Glushchenko, to restrain him if he resists those examinations, and to administer hydration to Respondent Eugenii Glushchenko if necessary to preserve his life.

**JURISDICTION**

1. This Court has jurisdiction pursuant to 28 U.S.C. § 1345 because the United States of America is the Petitioner.

**VENUE**

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part

of the events giving rise to the claim occurred in this district, in and near the Eloy Detention Center (EDC), Eloy, Arizona.

**FACTS**

3.  Eugenii Glushchenko, Axxx xxx 460, is a 37-year-old male who is a native and citizen of Russia.

4.  On April 16, 2019, an Immigration Judge ordered Mr. Glushchenko removed from the United States to Russia.

5.  Mr. Glushchenko was not represented by counsel during his removal proceedings.

6.  Upon information and belief, Mr. Glushchenko is not currently represented by counsel.

7.  Mr. Glushchenko has been detained at EDC since September 5, 2018, pending removal from the United States.

8.  On June 17, 2019, ICE attempted to effect Mr. Glushchenko's removal order to Russia via commercial airliner. Mr. Glushchenko refused to board the transport van to the airport and indicated he would refuse to board the commercial airliner if taken to the airport.

**Mr. Glushchenko's Hunger Strike**

9.  On June 19, 2019, Mr. Glushchenko declared to ICE Enforcement and Removal Operations (ERO) officers that he was going on a hunger strike.

10. Mr. Glushchenko's last meal was breakfast on June 19, 2019.

11. Mr. Glushchenko has missed 63 meals since eating his last meal.

12. Mr. Glushchenko has attributed his refusal to eat, alternatively, to not being hungry, or to not eating until he is released from detention.

13. On the morning of June 23, 2019, IHSC medical personnel reported that Mr. Glushchenko was refusing all efforts to assess his physical condition.

14. On the evening of June 26, 2019, Mr. Glushchenko was transported to the Banner Casa Grande Medical Center (BCGMC) in Casa Grande, Arizona, to be evaluated

for dehydration and low blood pressure.

15. Upon arriving at the BCGMC, Mr. Glushchenko accepted intravenous (IV) hydration and a medical examination. Upon his discharge and return to the EDC on June 26, 2019, however, Mr. Glushchenko again refused all evaluation and treatment.

16. On July 2, 2019, Mr. Glushchenko was again transported to BCGMC for evaluation for dehydration and hypernatremia (a deficit of total body water relative to total body sodium caused by water intake being less than water losses). While at the hospital, Mr. Glushchenko initially accepted IV fluids, but refused medications and a potassium supplement.

17. On July 4, 2019, Mr. Glushchenko was returned to the EDC. Since then, Mr. Glushchenko has refused to allow medical staff to monitor his condition; he continues to refuse water and food as well.

18. On July 7, 2019, Mr. Glushchenko was transported to the Maricopa Medical Center (MMC) for evaluation for dehydration and starvation. At the MMC, Mr. Glushchenko initially refused food, treatment, and IV hydration. MMC medical personnel began administering saline to Mr. Glushchenko via IV, but he began clinching his arm and asked MMC personnel to remove the IV. Late in the evening on July 7, 2019, Mr. Glushchenko finally allowed MMC staff to check his vitals and submitted to some testing. On July 8, 2019, while still at the MMC, Mr. Glushchenko accepted IV hydration, ate some ice chips, and drank some apple juice. Mr. Glushchenko was discharged from the MMC on July 8, 2019, and returned to the EDC.

19. Since Mr. Glushchenko ceased eating, both the medical staff and the detention and removal staff have tried to convince Mr. Glushchenko to eat.

20. The medical staff has explained to Mr. Glushchenko that if he continues to not eat and drink, his health will be seriously jeopardized, and he will eventually die. Despite repeated efforts to convince Mr. Glushchenko to eat, he has responded that he will eat when he feels hungry.

21. Mr. Glushchenko has been counseled about involuntary medical monitoring

1 and restraints that may be employed to prevent injury and or death should he continue to
2 refuse monitoring and care during his hunger strike.

3     22.    Mr. Glushchenko has been counseled about involuntary hydration, and
4 feeding procedures that may be employed to prevent injury and or death should he continue
5 not to hydrate or eat.

## **Medical Necessity**

7     23.    Mr. Glushchenko has been evaluated by the mental health team at the EDC
8 in efforts to have him discontinue his hunger strike.

9     24.    He does not have any known psychiatric condition that would cause him not
10 to eat.

11     25.    In addition to refusing meals, Mr. Glushchenko is also refusing vital signs
12 monitoring, physical examination, glucose checks, laboratory tests, and weight assessment.

13     26.    Because Mr. Glushchenko has refused to allow EDC medical staff to weigh
14 him during his hunger strike, his last known weight at the EDC was 160 pounds on
15 January 24, 2019.

16     27.    Mr. Glushchenko's weight on June 26, 2019, taken at the Banner Casa
17 Grande Emergency Department was 142 pounds.

18     28.    Mr. Glushchenko's last documented weight measurement, taken at the
19 Maricopa Medical Center Emergency Department on July 8, 2019, was 120 pounds.

20     29.    This indicates a 25% decline from baseline weight in January 2019.

21     30.    A weight loss of 18% below initial weight can result in serious medical
22 problems, such as liver, kidney, and brain failure. In fact, medical literature reflects that
23 metabolic imbalance caused by fasting is likely to result in permanent bodily damage
24 and/or death once weight loss reaches 18% of the patient's initial weight.

25     31.    Dehydration greatly accelerates a progressive starvation because the waste
26 that the body produces is not excreted.

27     32.    Medical staff and security personnel at EDC have observed Mr. Glushchenko
28 drinking a negligible amount of fluids at EDC in 22 days.

33. He did permit off-site medical staff to provide limited intervention in a hospital setting on June 26, 2019, July 2-4, 2019, and on July 7-8, 2019, where he received intravenous fluids, a computed tomography (CT) scan of the spine, and laboratory work.

34. At his July 7-8, 2019, hospital visit, he did eat ice chips and drink some apple juice, after receiving IV fluids, but declined further medical intervention against medical advice.

35. Upon returning to the EDC on July 8, 2019, Mr. Glushchenko reiterated his intent to not comply with medical monitoring, receive medical treatment, or voluntarily consume fluids or any type of nourishment.

36. Mr. Glushchenko is progressively becoming lethargic, lying in bed most of the time, since the beginning of his hunger strike.

37. Due to the inability to assess his exact medical state, there is concern of Mr. Glushchenko going into kidney failure, liver failure, heart failure, and death.

38. It is difficult to predict for how long the human body can survive without food, and if an individual does not have adequate fat stored, this time decreases significantly.

39. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms severe enough to warrant hospitalization.

40. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

41. Medical monitoring through vital signs, laboratory tests, weight checks, and physical examinations is critical to time-appropriate medical interventions.

42. For a patient on a hunger strike, the following evaluations are necessary: laboratory test at least every 48–72 hours; physical examination daily; urinalysis; daily weight checks; and frequent taking of vital signs.

43. At this stage of the hunger strike, Mr. Glushchenko has reached a point where he will require immediate medical intervention to prevent further deterioration and serious medical complications.

44. Continued fasting will result in permanent damage to internal organs and has the potential to become life threatening.

45. If laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer medications intravenously to address those other conditions.

46. Should Mr. Glushchenko refuse to cooperate with blood work and other necessary medical monitoring and testing, medical soft restraints may be required to immobilize him and prevent unnecessary injury to both Mr. Glushchenko and the medical staff.

47. In light of all the circumstances above, it is medically necessary to perform medical examinations, vital signs checks, weight checks, laboratory testing as clinically indicated, and intravenous hydration to monitor Mr. Glushchenko's physical condition and ensure his health.

## **Effect on Security and Orderly Institutional Operations**

48. The death of Mr. Glushchenko from his hunger strike would seriously affect ICE's ability to provide for the health and safety of detainees at the EDC in the following ways:

   a. Perceptions may be formed by the ICE detained population that ICE will simply let Mr. Glushchenko die, without intervening to save him, which could lead to acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of EDC.

   b. Tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

   c. For a detainee to cause his own death without staff intervention would undermine DHS's obligation to render appropriate medical care and prevent detainee suicides.

   d. Other detainees may decide to commit suicide by starving themselves.

   e. Other detainees may decide that they have lost confidence in the

medical staff at EDC to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergencies that could have been avoided had the detainee sought medical help at an earlier time.

  f. Detainees who participate in hunger strikes may severely and permanently damage their health, requiring DHS to expend large sums of money for their immediate and long-term medical care.

  g. Other detainees may participate in hunger strikes to attempt to manipulate the staff to gain various benefits and privileges.

  h. Some detainees will voice threats to go on a hunger strike, gaining additional staff attention, drawing staff attention away from other detainees.

  i. If a detainee is permitted to die from starvation, the community's perception of ICE and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

  j. The failure to provide necessary medical care could expose the United States and its employees to various claims of liability and lawsuits from family members of deceased detainees who assert that DHS, through ICE, should have acted to forestall the detainee's physical harm or death by involuntary medical treatment, which may include medical monitoring, hydration and/or force-feeding the detainee. The burdens of responding to administrative claims and lawsuits would result in a drain on staff time and resources and distract staff from their regular duties of ensuring the safety of ICE detainees at EDC.

49. In light of all the circumstances above, it is necessary for the security and orderly institutional operations of EDC to conduct involuntary blood draws and weight checks, to insert urinary catheters, and perform routine medical examinations on

7

1 Respondent Glushchenko, and to administer hydration to Respondent Glushchenko in order to preserve his life.

## CAUSE OF ACTION

1. The Secretary of DHS, through ICE, is authorized to provide medical treatment to aliens who require treatment during removal proceedings. 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a).

2. There are legitimate government interests in preserving the life of an immigration detainee, maintaining security and orderly operations in immigration detention facilities, and avoiding burdensome and unnecessary litigation.

3. There is a valid and rational connection between these government interests and the above-described involuntary medical examinations, restraints, and administration of hydration to Mr. Glushchenko.

4. Mr. Glushchenko has alternative means to exercise his constitutional rights.

5. The above-described involuntary medical examinations, restraints, and/or hydration of Mr. Glushchenko are essential and not exaggerated.

## PRAYER FOR RELIEF

WHEREFORE, the Government prays:

1. That the Court issue a Temporary Order permitting the United States, through competent medical providers employed by or contracted with IHSC, to conduct involuntary blood draws and weight checks, to insert urinary catheters, and perform routine medical examinations on Respondent Glushchenko;

2. That the Court issue a Temporary Order permitting the United States, through competent medical providers employed by or contracted with IHSC, to administer hydration to Respondent Glushchenko involuntarily, if necessary to preserve his life;

3. That the Court issue a Temporary Order permitting the United States, through competent medical providers employed by or contracted with IHSC, to restrain Respondent Glushchenko if he resists efforts to draw blood, be weighed, have urinary catheters inserted, have routine medical examinations conducted, or have hydration

1 administered;

2     4.    That the Court set this matter for hearing as soon as practicable so that it can determine the rights of Respondent Glushchenko; and

    5.    For other such relief as the Court deems appropriate.

Respectfully submitted this 10th day of July, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Bill C. Solomon*
BILL C. SOLOMON
Assistant U.S. Attorney
*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing. and mailed a copy of the foregoing First Class Mail addressed to the following individual, who is not registered in the CM/ECF System:

**Eugenii Glushchenko** (Axxx xxx 460)
Eloy Detention Center
5501 N. La Palma Road
Eloy, AZ 85131
*Respondent*

*s/ Lauren M. Routen*
United States Attorney's Office