IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| Glushchenko, Eugenii | § |
| | § |
| Defendant. | § |

## DECLARATION OF DALE WELSH, PA-C

In accordance with 28 U.S.C. § 1746, I, Dale Welsh, PA-C, make the following unsworn declaration, under penalty of perjury, pertinent to the above-styled and numbered cause:

1. I am a commissioned officer in the U.S. Public Health Service currently detailed to the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC). I provide medical care to detainees being held in the custody of ICE.

2. I serve as a Physician Assistant at the Eloy Detention Center in Eloy, Arizona. I have been assigned to this facility since March 2019. I have been a Physician Assistant since September 2011, and I am licensed by the state of Arizona to practice medicine. All care for this patient has been coordinated and reviewed with concurrence from Daren R. Mealer, MD, MPA, FAAFP, IHSC Western Regional Clinical Director, who is based at the ICE – Office of Enforcement and Removal Operations Seattle Field Office in Seattle, Washington. Additional concurrence is received from Eloy Acting Clinical Director CAPT Luzviminda Peredo-Berger, MD who is based in Port Isabel, Texas.

3. I make this declaration upon a review of Mr. Eugenii Glushchenko's medical record, and my examination and treatment of Mr. Glushchenko.

4. This affidavit is made in support of the petition by DHS-ICE to obtain a court order for regular medical monitoring and provision of hydration to Mr. Glushchenko for the purposes of irreparable physical damage or death. These measures would include daily weight measurements and necessary physical examination. Additionally, laboratory blood work and urinalysis would be required every 48 to 72 hours. Proper medical monitoring of Mr. Glushchenko's state of health is necessary to ensure that medical staff can accurately assess and determine when, or if it may be necessary, to seek immediate medical intervention, such as involuntary

1

IV hydration, in order to avoid irreparable physical damage or to preserve Mr. Glushchenko's life.

5. Mr. Glushchenko is a 37-year-old male who has been detained at the EDC since September 5, 2018, pending removal from the United States. He is a native and citizen of Russia. Mr. Glushchenko has been on a self-imposed hunger strike since June 19, 2019, at which time he consumed his last meal, being breakfast on that day. At the ninth missed meal, on June 22, 2019, he was placed on official hunger strike protocol, which included continuance of daily observation and medical monitoring for which he had been housed in the EDC Segregation unit since June 17, 2019. Mr. Glushchenko has not permitted EDC medical staff to measure his weight throughout the duration of his hunger strike.

6. Mr. Glushchenko continues to refuse meals offered to him daily and now meets criteria for a diagnosis of malnutrition as defined by IHSC criteria to include his rate and extent of weight loss. A 5% weight loss from baseline in 1 month or a 7.5% weight loss from baseline within 3 months is considered diagnostic for malnutrition. Mr. Glushchenko's weight at the Banner Casa Grande Emergency Department on June 26, 2019, was 142 lbs., and his last documented weight on July 8, 2019, is 120.0 pounds, taken at the Maricopa Medical Center Emergency Department. The pre-hunger strike weight used to calculate his total weight lost was 160 lbs. and was obtained on January 24, 2019, which was the last recorded date in his medical records. Mr. Glushchenko would not allow Eloy medical staff to weigh him during his hunger strike, so his January 24, 2019 weight is our last known baseline weight. To date, Mr. Glushchenko has a recorded 40-pound weight loss which is a 25% decline from baseline weight. This provides him with a current body mass index (BMI) of 18.2%, based on a height of 70 inches. Normal BMI is 18.5% - 24.9%. Based on his rapid rate of weight loss and his total weight loss, Mr. Glushchenko is underweight and malnourished.

7. Mr. Glushchenko has been evaluated by the mental health team at EDC. He does not have any known psychiatric condition that would cause him not to eat.

8. Mr. Glushchenko has refused medical examinations and monitoring by the EDC medical staff since June 23, 2019. He did permit off-site medical staff to provide limited intervention in a hospital setting on June 26, 2019, July 2-4, 2019, and on July 7-8, 2019, where he received intravenous (IV) fluids, a computed tomography (CT) scan of the spine, and laboratory work. At his July 7-8, 2019 visit, he did eat ice chips and drink some apple juice, after receiving IV fluids but declined further medical intervention against medical advice. Upon return to EDC on July 8, 2019, he reiterated his intent to not comply with medical monitoring, receive medical treatment, nor voluntarily consume fluids or any type of nourishment.

9. To date, Mr. Glushchenko's hunger strike has lasted 22 days, and he has missed a total of 63 meals since his first documented missed meal on June 19, 2019. Mr. Glushchenko is alert and oriented to person, place and time. Medical staff and

2

security personnel have observed him drinking a negligible amount of fluids at EDC in 22 days. Mr. Glushchenko is progressively becoming lethargic (lying in bed most of the time) since the beginning of his hunger strike. His current physical condition is fragile as he presented to the emergency room on July 7, 2019 with a creatinine phosphokinase (CPK) of 1,465 (normal 55-170), which is indicative of a muscle breakdown state that poses a significant morbidity risk without aggressive medical treatment. Treatment with IV fluids helped reduce the CPK level to 844, which remains high and continues to pose mortality risk. Because Mr. Glushchenko refuses to comply with requests to discontinue his hunger strike and resume eating, a court order for medical examinations, vital signs checks to include weight measurement, laboratory testing as needed, and intravenous hydration is being sought prior to his condition decompensating to a critical juncture.

10. Mr. Glushchenko has been counseled daily by medical staff on the effects of self-imposed dehydration and starvation on his body as well as involuntary medical examination, hydration and feeding procedures to prevent injury and/or death to himself should he continue not to eat.

11. Patients suffering from starvation and dehydration follow a predictable pattern of progressive kidney failure, liver failure, heart failure, and death. This will occur if Mr. Glushchenko continues his hunger strike.

12. It is difficult to predict for how long the human body can survive without food, and if an individual does not have adequate fat stored, this time decreases significantly. A weight loss of 18 percent below initial weight can result in serious medical problems such as liver, kidney and brain failure. Weight loss of 30 percent or more below the initial weight is considered life-threatening. Dehydration produces a fluid volume imbalance in the body, which in combination with all the other factors could lead to an arrhythmia, heart attack, and major body organ failure. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. Medical literature reflects that metabolic imbalance caused by fasting is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight. Mr. Glushchenko is now at 25% of initial weight.

13. Mr. Glushchenko has been provided with information on the medical necessity to eat and drink to preserve his health and the medical risks incurred during a hunger strike. I have personally explained to Mr. Glushchenko our concerns regarding his condition and the medical risks involved with a continued lack of inappropriate nourishment. If he continues to be on a hunger strike he will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys, liver, heart failure and the risk of death. The Eloy medical providers have counseled Mr. Glushchenko about the effects of self-imposed

dehydration and starvation on the body. He has been informed of involuntary hydration and feeding procedures that could be done to prevent injury and or death to him should he continue not to eat.

14. In my professional medical judgment, in consultation with and the concurrence of Daren R. Mealer, MD, MPA, FAAFP and CAPT Luzviminda Peredo-Berger, MD, at this stage in the hunger strike, he has reached a point where he will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated will cause fatal arrhythmia or cardiac arrest. Medical intervention will require an intravenous line to provide Mr. Glushchenko the hydration he needs. Also, it will be necessary to perform laboratory tests and physical evaluation to monitor and assess his clinical condition. If his laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer such medications intravenously.

15. During the first three days of a hunger strike, the body will start using the glycogen storage to maintain glucose levels. This storage will rarely last more than 72 hours. Between day 4 and day 13, the brain and red blood cells require glucose as an energy source, and in view of depletion of glycogen storage, the body will start obtaining glucose from non-carbohydrate sources (for example muscle protein) and fatty acids. In this phase the body will experience loss of body fat, protein and total body electrolytes such as potassium, phosphate and magnesium. The body will maintain the serum electrolyte levels at the expense of intracellular stores. Between day 14 and day 34 thiamine deficiency occurs. In my professional medical judgment, it is necessary to obtain a court order to require laboratory test at least every 48–72 hours, physical examination daily, daily weights, frequent vital signs, and intravenous hydration as needed. Laboratory tests are needed to evaluate his metabolic state to include electrolytes and kidney function. The laboratory test that need to be obtain during a hunger strike include:

   a. Complete metabolic panel. This test reveals an increase in markers of kidney function in view of any renal injury. The panel tests BUN (blood urea nitrogen) creatinine level and proteins. It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels.
   b. Complete blood count. This test reveals the hemoglobin level.
   c. Urinalysis, which reveals the presence of ketones, blood and crystals in the urine.
   d. Thiamine levels to assess deficiency at day 14 of a hunger strike.
   e. Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.
   f. Total CPK, which is an enzyme found inside muscle cells and is released into the blood, when the muscle cells rupture. The increase in CPK can lead

       Rhabdomyolysis, destruction of muscle tissue and acute kidney failure; which may leave detainees on dialysis for the rest of their lives.

    g. Pre-albumin is used as a marker for nutritional status evaluation. Pre-albumin will decrease over time the longer a patient fails to consume adequate nutrition, and the pre-albumin level correlates with patient morbidity and mortality risk. Normal pre-albumin is 14-35 mg/dL. When pre-albumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

16. In order to ensure the patient's medical safety, should he refuse to cooperate with blood work, medical soft restraints will be required to immobilize and prevent unnecessary injury to both Mr. Glushchenko and medical staff.

17. In light of Mr. Glushchenko's hunger strike and history of refusal of medical care, in my professional judgment, with the concurrence of Daren R. Mealer, MD, MPA, FAAFP and CAPT Luzviminda Peredo-Berger, MD, it is medically necessary to obtain a court order for involuntary medical examinations, vital signs checks to include weight measurement, laboratory testing as clinically indicated, and intravenous hydration to monitor his physical condition and ensure his health.

Executed this 10th day of July 2019.

*[signature]*

LCDR Dale Welsh, PA-C
Clinical Physician Assistant
ICE Health Service Corps
United States Public Health Service