IN THE UNITED STATES DISTRICT COURT

**In the Matter of Eugenii GLUSHCHENKO (Axxx xxx 460)**

**DECLARATION OF Jason Ciliberti**

I, Jason Ciliberti, hereby declare:

1. I am the Assistant Field Office Director (AFOD) of the Eloy Detention Center (EDC), Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Phoenix Field Office. My responsibilities as the AFOD include the supervision of the employees working in the detention and removal units at the EDC and monitoring the care of ICE detainees at the EDC.

2. I am providing this declaration based upon my personal knowledge and review of administrative records.

3. Eugenii Glushchenko, Axxx xxx 460, is a Russian national currently detained at the EDC.

4. On April 16, 2019, an Immigration Judge ordered Mr. Glushchenko removed from the United States to Russia.

5. On June 17, 2019, ICE attempted to effect Mr. Glushchenko's removal order to Russia via commercial airliner. Mr. Glushchenko refused to board the transport van to the airport and indicated he would refuse to board the commercial airliner if taken to the airport.

6. Mr. Glushchenko was not represented by counsel during his removal proceedings.

7. On June 19, 2019, Mr. Glushchenko declared to ERO officers that he was going on a hunger strike. At alternate times, Mr. Glushchenko would state he was not eating because he was not hungry, or that he will not eat until he is released from detention.

8. Mr. Glushchenko's last meal was breakfast on June 19, 2019.

9. On the morning of June 23, 2019, ICE Health Service Corps (IHSC) personnel reported that Mr. Glushchenko was refusing all efforts to assess his physical condition.

10. On the evening of June 26, 2019, Mr. Glushchenko was transported to the Banner Casa Grande Medical Center (BCGMC) in Casa Grande, Arizona, to be evaluated for dehydration and low blood pressure.

11. Upon arriving at the BCGMC, Mr. Glushchenko accepted IV hydration and a medical examination. However, upon his discharge and return to the EDC on June 26, 2019, Mr. Glushchenko refused all evaluation and treatment.

12. On July 2, 2019, Mr. Glushchenko was again transported to the BCGMC for evaluation of dehydration and hypernatremia (a deficit of total body water relative to total body sodium caused by water intake being less than water losses). While at the hospital, Mr. Glushchenko initially accepted IV fluids but refused medications and a potassium supplement.

13. On July 4, 2019, Mr. Glushchenko was returned to the EDC. Since his return to the EDC Mr. Glushchenko has refused to allow medical staff to monitor his condition and continues to refuse water and food as well.

14. On July 7, 2019, Mr. Glushchenko was transported to the Maricopa Medical Center (MMC) for evaluation for dehydration and starvation. At the MMC, he initially refused food, treatment, and IV hydration. The MMC began to give him a saline IV, but he began clenching his arm and asked MMC to remove the IV. Late in the evening on July 7, 2019, he finally allowed MMC staff to check his vitals and submitted to some testing. On July 8, 2019, while still at MMC, he accepted IV hydration, ate some ice chips, and drank some apple juice. Mr. Glushchenko was discharged from the MMC on July 8, 2019 and returned to the EDC.

15. Since Mr. Glushchenko ceased eating, both the medical staff and the detention and removal staff have tried to convince Mr. Glushchenko to eat. It has been explained to Mr. Glushchenko that if he continues to not eat and drink, his health will be seriously jeopardized, and he will eventually die. Despite repeated efforts to convince Mr. Glushchenko to eat, he has responded that he will eat when he feels hungry.

16. Medical staff at the EDC has informed me that it is medically necessary to compel Mr. Glushchenko to submit to vital sign checks, lab draws, and medical assessments to ensure his health and prevent his death due to medical complications related to his refusal to eat and drink. Medical staff at the EDC have also informed me that should Mr. Glushchenko continue to refuse food and water, it may soon become medically necessary to involuntarily hydrate Mr. Glushchenko.

17. The death of Mr. Glushchenko, resulting from his hunger strike, would seriously affect ICE's ability to provide for the health and safety of detainees at the EDC in the following ways:

    a. My foremost obligation is to maintain the safety and security of the ICE detainees housed at the EDC and provide for the health and well-being of the detainees. Perceptions may be formed by the ICE detained population that ICE will simply let Mr. Glushchenko die, without intervening to save him, which could lead to acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of the EDC. I am concerned that hunger strikes, or other disruptive or violent acts would be directed at staff, to express detainee anger, resentment, and frustration.

    b. If such disruptive acts were to occur, tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

    c. For a detainee to cause his own death without staff intervention would completely undermine DHS's obligation to render appropriate medical care and prevent detainee suicides. Other detainees may decide to commit suicide by starving themselves to death.

    d. Other detainees may decide that they have lost confidence in the skills, ability, or willingness of medical staff at the EDC to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time.

    e. Detainees who participate in hunger strikes may severely and permanently damage their health, requiring DHS to unnecessarily expend large sums of money for their immediate and long-term medical care.

    f. Other detainees may participate in hunger strikes to attempt to manipulate the staff to gain various benefits and privileges. For example, detainees may initiate hunger strikes to pressure staff to transfer them away from the EDC, or to gain their release from detention. Without the ability to intervene when medically

        necessary, the EDC will be forced to choose between letting the detainee die and giving in to his wishes.

    g.    Some detainees will merely voice threats to go on a hunger strike, gaining additional staff attention, drawing staff attention away from other detainees.

    h.    If a detainee is permitted to die from starvation, the community's perception of ICE and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

    i.    Under the law as I understand it, as the AFOD at the EDC, I have an obligation to enforce the Detention Standards set forth in the Detention Operations Manual, which include an obligation to ensure appropriate medical care to detainees and to act to preserve and protect detainees' lives while they are detained at the EDC. If detainees are not force-fed when medically necessary, the failure to provide such medical care could expose the United States and its employees to various claims of liability and lawsuits from family members of deceased detainees who assert that DHS, through ICE, should have acted to forestall the detainee's death by involuntary medical treatment, which may include medical monitoring, hydration and/or force-feeding the detainee. Whether or not the family members would ultimately prevail in such litigation, the burdens of responding to administrative claims and lawsuits would result in a drain on staff time and resources and distract staff from their regular duties of ensuring the safety of ICE detainees at the EDC.

18. For the reasons stated above, the adverse effects resulting from not medically-monitoring Mr. Glushchenko's condition and force-hydrating him (if deemed medically necessary) would harm my ability to provide proper care for ICE detainees at the EDC.

19. In my judgment, as the AFOD responsible for ICE detainees at the EDC, to protect Mr. Glushchenko and to protect security and good order at the EDC, it is imperative to medically-monitor Mr. Glushchenko, and to force-hydrate him (if deemed medically necessary) to preserve his life.

20. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed July 9, 2019, in Eloy, Arizona.

_____
Jason Ciliberti
Assistant Field Office Director
Phoenix Field Office