MICHAEL BAILEY
United States Attorney
District of Arizona
BILL C. SOLOMON
Assistant U.S. Attorney
State Bar No. 020012
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile: (602) 514-7696
E-Mail: William.Solomon@usdoj.gov

*Attorneys for the United States of America*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United States of America, | Case No. _____ |
|---|---|
| Petitioner, | **MOTION FOR EMERGENCY TEMPORARY ORDER TO PERFORM INVOLUNTARY MEDICAL EXAMINATIONS AND ADMINISTER INVOLUNTARY HYDRATION** |
| v. | |
| Eugenii Glushchenko, | |
| Respondent. | |

Petitioner United States of America requests an emergency temporary order permitting the Secretary of the Department of Homeland Security (DHS), through component agencies, Immigration and Customs Enforcement (ICE) and the Public Health Service, Division of Immigration Health Services Corps (IHSC), to perform involuntary medical examinations of Respondent Eugenii Glushchenko, to administer involuntary hydration to Mr. Glushchenko, and to restrain him if he resists those examination or hydration efforts. This motion is supported by the following memorandum of points and authorities, the attached exhibits, and all matters of record.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**FACTUAL BACKGROUND**

Eugenii Glushchenko, A- - - - - - 460, is a 37-year-old male who is a native and

citizen of Russia. On April 16, 2019, an Immigration Judge ordered Mr. Glushchenko removed from the United States to Russia. Mr. Glushchenko was not represented by counsel during his removal proceedings. Upon information and belief, Mr. Glushchenko is not currently represented by counsel. Mr. Glushchenko has been detained at the Eloy Detention Center (EDC), since September 5, 2018, pending removal from the United States. Decl. of Dale Welsh, PA-C, ¶ 5 (July 10, 2019)(Exhibit 1). ICE Enforcement and Removal Operations (ERO) attempted to effect Mr. Glushchenko's removal order to Russia on June 17, 2019, via commercial airliner. Mr. Glushchenko refused to board the transport van to the airport and indicated he would refuse to board the commercial airliner if taken to the airport. Decl. of Jason Ciliberti ¶¶ 3–6 (July 9, 2019)(Exhibit 2).

### Mr. Glushchenko's Hunger Strike

On June 19, 2019, Mr. Glushchenko declared to ERO officers that he was going on a hunger strike. Mr. Glushchenko's last meal was breakfast on June 19, 2019. Mr. Glushchenko has missed 63 meals since eating his last meal. Mr. Glushchenko's refusal to eat is based, alternatively, on not being hungry and on not eating until he is released from detention. Decl. of William Crane, M.D., ¶¶ 5, 9; Ciliberti Decl. ¶¶ 7–8.

On the morning of June 23, 2019, IHSC medical personnel reported that Mr. Glushchenko was refusing all efforts to assess his physical condition. On the evening of June 26, 2019, Mr. Glushchenko was transported to the Banner Casa Grande Medical Center (BCGMC) in Casa Grande, Arizona, to be evaluated for dehydration and low blood pressure. Upon arriving at the BCGMC, Mr. Glushchenko accepted intravenous (IV) hydration and a medical examination. Upon his discharge and return to the EDC on June 26, 2019, however, Mr. Glushchenko again refused all evaluation and treatment. Ciliberti Decl. ¶¶ 9–11.

On July 2, 2019, Mr. Glushchenko was again transported to BCGMC for evaluation for dehydration and hypernatremia (a deficit of total body water relative to total body sodium caused by water intake being less than water losses). While at the hospital, Mr. Glushchenko initially accepted IV fluids, but refused medications and a potassium

supplement. On July 4, 2019, Mr. Glushchenko was returned to the EDC. Since then, Mr. Glushchenko has refused to allow medical staff to monitor his condition; he continues to refuse water and food as well. Ciliberti Decl. ¶¶ 12-13.

On July 7, 2019, Mr. Glushchenko was transported to the Maricopa Medical Center (MMC) for evaluation for dehydration and starvation. AT the MMC, Mr. Glushchenko initially refused food, treatment, and IV hydration. MMC medical personnel began administering Mr. Glushchenko saline via IV, but he began clinching his arm and asked MMC personnel to remove the IV. Late in the evening on July 7, 2019, Mr. Glushchenko finally allowed MMC staff to check his vitals and submitted to some testing. On July 8, 2019, while still at the MMC, Mr. Glushchenko accepted IV hydration, ate some ice chips, and drank some apple juice. Mr. Glushchenko was discharged from the MMC on July 8, 2019, and returned to the EDC. Upon return to the EDC, Mr. Glushchenko reiterated his intent to not comply with medical monitoring, receive medical treatment, or voluntarily consume fluids or any type of nourishment. Welsh Decl. ¶ 8; Ciliberti Decl. ¶ 14.

Since Mr. Glushchenko ceased eating on June 19, 2019, both the medical staff and the detention and removal staff have repeatedly tried to convince Mr. Glushchenko to eat. The medical staff has explained to Mr. Glushchenko the medical necessity to eat and drink to preserve his health as well as the medical risks incurred during a hunger strike. Mr. Glushchenko continues to refuse to resume eating, stating that he will eat when he feels hungry. Mr. Glushchenko has been counseled that if he continues to not hydrate or eat his health will be seriously jeopardized, and he will eventually die. Mr. Glushchenko has also been counseled that involuntary hydration procedures may be employed to prevent injury and or death should he continue not to hydrate or eat. Welsh Decl. ¶¶ 10, 13; Ciliberti Decl. ¶ 15.

**Medical Necessity**

Mr. Glushchenko has been on a self-imposed hunger strike since June 19, 2019. He has been evaluated by the mental health team at the EDC in efforts to have him discontinue his hunger strike. He does not have any known psychiatric condition that would cause him

not to eat. In addition to refusing meals, Mr. Glushchenko is also refusing medical examination, monitoring, and weight assessment. Welsh Decl. ¶¶ 5-8.

Because Mr. Glushchenko has refused to allow EDC medical staff to weigh him during his hunger strike, his last known weight at the EDC was 160 pounds on January 24, 2019. Mr. Glushchenko's weight on June 26, 2019, taken at the Banner Casa Grande Emergency Department was 142 pounds. Mr. Glushchenko's last documented weight measurement, taken at the Maricopa Medical Center Emergency Department on July 8, 2019, was 120 pounds. This indicates a 25% decline from baseline weight in January 2019. Welsh Decl. ¶ 6.

A weight loss of 18% below initial weight can result in serious medical problems, such as liver, kidney, and brain failure. In fact, medical literature reflects that metabolic imbalance caused by fasting is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Welsh Decl. ¶ 12.

Medical staff and security personnel at EDC have observed Mr. Glushchenko drinking a negligible amount of fluids at EDC in 22 days. He did permit off-site medical staff to provide limited intervention in a hospital setting on June 26, 2019, July 2-4, 2019, and July 7-8, 2019, where he received intravenous fluids, a computed tomography (CT) scan of the spine, and laboratory work. At his July 7-8, 2019, hospital visit, he did eat ice chips and drink some apple juice, after receiving IV fluids, but declined further medical intervention against medical advice. Upon returning to the EDC on July 8, 2019, Mr. Glushchenko reiterated his intent to not comply with medical monitoring, receive medical treatment, or voluntarily consume fluids or any type of nourishment. Welsh Decl. ¶¶ 8-9.

Mr. Glushchenko is progressively becoming lethargic, lying in bed most of the time, since the beginning of his hunger strike. Due to the inability to assess his exact medical state, there is concern of Mr. Glushchenko going into kidney failure, liver failure, heart failure, and death. It is difficult to predict for how long the human body can survive without

food, and if an individual does not have adequate fat stored, this time decreases significantly. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms severe enough to warrant hospitalization. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest. Welsh Decl. ¶¶ 9, 11-13.

Medical monitoring through vital signs, laboratory tests, weight checks, and physical examinations is critical to time-appropriate medical interventions. For a patient on a hunger strike, the following evaluations are necessary: laboratory test at least every 48–72 hours; physical examination daily; urinalysis; daily weight checks; and frequent taking of vital signs. Welsh Decl. ¶¶ 14-15.

At this stage of the hunger strike, Mr. Gluhschenko has reached a point where he will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to internal organs and has the potential to become life threatening. If laboratory tests reveal other conditions requiring medical attention, it may be necessary to administer medications intravenously to address those other conditions. Welsh Decl. ¶ 14.

In light of all the circumstances above, it is medically necessary to perform medical examinations, vital signs checks, weight checks, laboratory testing as clinically indicated, and intravenous hydration to monitor Mr. Glushchenko's physical condition and ensure his health. Should Mr. Glushchenko refuse to cooperate with blood work and other necessary medical monitoring and testing, medical soft restraints may be required to immobilize him and prevent unnecessary injury to both Mr. Glushchenko and the medical staff. Welsh Decl. ¶¶ 16-17.

**Effect on Security and Orderly Institutional Operations**

In light of all these circumstances above, in the professional opinion of Mr. Jason Ciliberti, the Assistant Field Office Director (AFOD) of the EDC, the death or permanent injury of Mr. Glushchenko from his hunger strike would seriously affect ICE's ability to provide for the health and safety of detainees at EDC in the following ways:

5

1. Perceptions may be formed by the ICE detained population that ICE will simply let Mr. Glushchenko die, without intervening to save him, which could lead to acts of detainee violence and disruptions. The detained population, having formed such a perception, could act alone or in groups to disrupt the operation of EDC.

2. Tensions between detainees and staff would be heightened, making almost all aspects of the detention operation more difficult for staff to perform.

3. For a detainee to cause his own death without staff intervention would undermine DHS's obligation to render appropriate medical care and prevent detainee suicides.

4. Other detainees may decide to commit suicide by starving themselves.

5. Other detainees may decide that they have lost confidence in the medical staff at EDC to administer medical care. They may be reluctant to seek treatment from the medical staff, reluctant to accept the treatments recommended, and may decide there is a need to "second guess" the judgments of the medical staff. They may simply refrain from seeking treatment for their illnesses from the medical staff, leading to emergencies that could have been avoided had the detainee sought medical help at an earlier time.

6. Detainees who participate in hunger strikes may severely and permanently damage their health, requiring DHS to expend large sums of money for their immediate and long-term medical care.

7. Other detainees may participate in hunger strikes to attempt to manipulate the staff to gain various benefits and privileges.

8. Some detainees will voice threats to go on a hunger strike, gaining additional staff attention, drawing staff attention away from other detainees.

9. If a detainee is permitted to die from starvation, the community's perception of ICE and its staff will be adversely affected. Members of the community expect that DHS will use its best efforts to preserve the lives of detainees while enforcing the immigration laws of the United States.

10. The failure to provide necessary medical care could expose the United States

and its employees to various claims of liability and lawsuits from family members of deceased detainees who assert that DHS, through ICE, should have acted to forestall the detainee's physical harm or death by involuntary medical treatment, which may include medical monitoring, hydration and/or force-feeding the detainee. The burdens of responding to administrative claims and lawsuits would result in a drain on staff time and resources and distract staff from their regular duties of ensuring the safety of ICE detainees at EDC. Ciliberti Decl. ¶ 17.

## ARGUMENT

**A.    Standards Governing Issuance of Temporary Restraining Order**

Pursuant to Federal Rule of Civil Procedure 65(b)(1), the Court may issue a temporary restraining order without notice only if:

(A)    specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B)    the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

The purpose of a temporary restraining order is to "preserv[e] the *status quo* and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Reno Air Racing Assoc., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (emphasis added) (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974)). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction cannot issue based on speculation or possibility. *Id.* at 20–24.

**B.     The United States Is Likely To Succeed On The Merits**

    **1.     The United States Has An Obligation to Prevent Harm to Mr. Glushchenko.**

Mr. Glushchenko has been detained at the EDC since September 5, 2018, pending removal from the United States. His detention is authorized by statute. *See* 8 U.S.C. § 1231(a)(2). The United States is responsible for his treatment and care while he is in custody and during the removal process. *DeShaney v. Winnebago Cnt'y Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989); 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a)(2).

    **2.     Mr. Glushchenko's Constitutional Rights Are Not Violated By Involuntary Medical Examinations or Involuntary Hydration.**

Mr. Glushchenko's constitutional rights are not violated by involuntary medical examinations or involuntary hydration. "'[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates.'" *In re Soliman*, 134 F. Supp. 2d 1238, 1252 (N.D. Ala. 2001), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002) (quoting *Turner v. Safley*, 482 U.S. 78, 84 (1987)). Finding that the difficulties of prison administration warrant special consideration, the Supreme Court articulated a standard of review for prisoners' constitutional claims "that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Turner*, 482 U.S. at 85 (alteration in original) (quoting *Procunier v. Martinez*, 416 U.S. 396, 406 (1974)).

The proper standard for determining the validity of a prison regulation or procedure claimed to infringe on an inmate's constitutional rights is to ask whether the regulation or procedure is "reasonably related to legitimate penological interests." *Id.* at 89; *In re Soliman*, 134 F. Supp. 2d at 1252. The Supreme Court has identified four factors that serve to channel the reasonableness inquiry: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest; (2) whether there are alternative means of exercising the asserted constitutional right; (3) whether and to what extent accommodation of the asserted right will have an impact on prison staff,

other inmates, and the allocation of resources; and (4) whether the regulation represents an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 89-91; *see also Hakim v. Hicks*, 223 F.3d 1244, 1247-48 (11th Cir. 2000), *cert. denied,* 121 S. Ct. 1382 (2001) (applying *Turner* standard to free exercise of religion claim where prison officials refused to recognize inmate's religious name change); *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) (same). Under this standard, the requested involuntary medical examinations, hydration, and restraints should be upheld against any claimed infringement upon First and Fourteenth Amendment rights because the United States can easily establish that the provision of life-saving medical care to hunger-striking detainees "bears a rational relation to legitimate penological interests." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The majority of courts that have considered the issue have held that orders authorizing involuntary medical examinations, restraints, and/or hydration do not violate a hunger-striking prisoner's constitutional rights. *See Aamer v. Obama*, 742 F.3d 1023, 1041, 1040 (D.C. Cir. 2014) (explaining that the "overwhelming majority of courts have concluded . . . that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death") (listing cases); *In re Grand Jury Subpoena John Doe*, 150 F.3d 170, 172 (2d Cir. 1998) (per curiam) ("In reviewing the district court's force-feeding order . . . we, like the majority of courts that have considered the question, hold that such an order does not violate a hunger-striking prisoner's constitutional rights."); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992), *cert. denied*, 507 U.S. 1009 (1993) (federal prisoner's allegation of force feeding by prison authorities did not state constitutional claim when attachments to pleadings reflected a medical determination that force feeding was necessary to the inmate's health, and that regulations authorized the force feeding of hunger striking inmates); *In re Sanchez*, 577 F. Supp. 7, 8 (S.D.N.Y. 1983) (rejecting hunger-striker's constitutional claims, stating that motive was to manipulate system to vacate her contempt order); *Bezio v. Dorsey*, 989 N.E.2d 942, 949-50 (N.Y. 2013) (applying *Turner* test and upholding

1  order that authorized state prison officials to intervene to prevent hunger-striking
2  prisoner's death by feeding via nasogastric tube, if necessary); *McNabb v. Dep't of Corr.*,
3  180 P.3d 1257, 1265 (Wash. 2008) (determining that the State's interests in applying
4  Department of Corrections' force-feeding policy to inmate outweighed inmate's right to
5  refuse artificial means of nutrition and hydration).

6  Courts also have recognized that the significant government interests in prison and
7  inmate safety and security outweigh any liberty interests that an inmate may have in
8  refusing medical treatment. *See, e.g., Freeman v. Berge*, 441 F.3d 543, 546–47 (7th Cir.
9  2006), *cert. denied* 549 U.S. 824 (2006) (discussing why prisoners have reduced liberty
10 interests in refusing life-saving medical treatment and refusing to eat); *Davis v. Agosto*,
11 89 Fed. App'x 523, 528 (6th Cir. 2004) (forced suturing of an open wound against
12 inmate's will did not violate inmate's due process or Eighth Amendment rights); *Parks
13 v. McCoy*, 35 Fed. App'x 239, 241 (7th Cir. 2002) (inmate forced to take tuberculosis
14 medication against her will based on a misdiagnosis did not state a constitutional claim);
15 *In re Grand Jury Subpoena John Doe*, 150 F.3d at 172 ("Other compelling governing
16 interests, such as preservation of life, prevention of suicide, and enforcement of prison
17 security, order, and discipline outweigh the constitutional rights asserted by Doe in the
18 circumstances of this case."); *Dumbrique v. Brunner*, No. 14-cv-02598, 2016 WL
19 3268875, at *5 (N.D. Cal. June 15, 2016) (finding prisoner had no constitutional right to
20 refuse to eat nor a liberty interest in refusing to eat), *cf. Inmates of Allegheny County Jail
21 v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (stating that federal courts will "disallow any
22 attempt to second-guess the propriety of a particular course of treatment" chosen by
23 prison doctors); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir. 1971) ("Obviously,
24 courts cannot go around second-guessing doctors."); *Garza v. Carlson*, 877 F.2d 14 (8th
25 Cir. 1989) (holding that "preservation of prisoners' health is certainly a legitimate
26 objective, and prison officials may take reasonable steps to accomplish their goal").

27  Mr. Glushchenko's hunger strike and refusal of any medical monitoring or care is
28 making it impossible for the United States to fulfill its responsibility to provide adequate

treatment and care to him, and is risking his permanent health and possibly his life. *Id*; *see also In re Abdel Fattah,* 2008 WL 2704541, at *1 (M.D. Pa. July 8, 2008) ("The evidence is that lack of water causes an imbalance in electrolytes and potassium. These deficiencies can have a serious impact on the heart, kidneys and liver."). It is necessary for the United States to conduct essential medical monitoring of Mr. Glushchenko during his hunger strike to assess whether his physical condition begins to deteriorate such that his health and life are in imminent jeopardy of permanent injury.

### C. The United States Is Likely To Suffer Irreparable Harm Absent an Emergency Order.

The United States has legitimate governmental interests in preserving the lives of individuals in its custody, maintaining security and orderly operations in its immigration detention facilities, and avoiding burdensome and unnecessary litigation. There is a valid rational connection between these government interests and the above-described involuntary medical examinations, restraints, and administration of hydration to Mr. Glushchenko.

The United States has a legitimate interest in providing potentially life-saving medical monitoring and care to preserve the life and prevent suicidal acts of individuals in its custody. It also has a statutory obligation and a constitutional duty under the Eight Amendment to safeguard the lives of the individuals it detains. *See* 8 U.S.C. § 1231(f); 8 C.F.R. § 241.2(a)(2); *see generally DeShaney*, 489 U.S. at 199–200; *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). As discussed above, courts have repeatedly recognized this interest when upholding the involuntary hydration and feeding of prisoners and detainees. Indeed, federal regulations governing management of inmates who engage in hunger strikes "authorize medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger." *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992); *see* 28 C.F.R. §§ 549.60–66 (2012).

The United States also has a legitimate interest in maintaining security and orderly operations in its immigration detention facilities. An inmate hunger strike can have a

11

significant destabilizing impact on institutions. "If prisoners are allowed to kill themselves, prisons would find it even more difficult than they already do to maintain discipline, because of the effect of a suicide in agitating other prisoners." *Freeman*, 441 F.3d at 547; *see also Bezio*, 989 N.E.2d at 950–51 ("[T]here is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution.") (collecting cases); *In re Soliman*, 134 F. Supp. 2d at 1253; *In re Grand Jury John Doe*, 150 F.3d at 172.

Finally, the United States has a legitimate interest in avoiding unnecessary and burdensome litigation. "Prison officials who let prisoners starve to death would also expose themselves to lawsuits by prisoners' estates. Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a federal civil rights suit." *Freeman*, 441 F.3d at 547; *see also Al-Zahrani v. Rodriguez*, 669 F.3d 315 (D.C. Cir. 2012) (damages lawsuit against United States officials related to suicide of Guantanamo Bay detainees); *Baires v. United States*, No. 09-cv-5171, 2011 WL 1743224, at *7 (N.D. Cal. May 6, 2011) (finding complaint stated claim for relief under the Federal Tort Claims Act for negligent medical care of immigration detainees). Even if such litigation is not successful, the burdens of responding to administrative claims and lawsuits would drain time and resources from many departments of the United States.

The likelihood of irreparable harm to the United States if Mr. Glushchenko is allowed to dehydrate or starve himself to death is substantial, as is the likelihood of irreparable physical and mental harm to Mr. Glushchenko. The United States cannot adequately care for Mr. Glushchenko while he continues to refuse medical monitoring, medical treatment, medication, and hydration. To prevent irreparable harm to both the United States and Mr. Glushchenko, the United States must be allowed to conduct essential medical monitoring of Mr. Glushchenko, and to administer hydration to Mr. Glushchenko, during his hunger strike. Essential medical monitoring includes involuntary blood draws and weight checks, insertion of urinary catheters, and routine medical examinations, as well as the use of medical soft restraints to immobilize Mr.

Glushchenko to prevent unnecessary injury to both Mr. Glushchenko and the medical staff should Mr. Glushchenko refuse to cooperate with hydration efforts, blood work, or other necessary medical monitoring and testing.

**D.  The Balance of Equities Favors the Issuance of a Temporary Order for Medical Examinations, Hydration, and Necessary Restraints.**

The public interest lies in preserving the health and safety of persons held in United States custody, for whose welfare the public has assumed responsibility, in avoiding the threat to the good order of the detention center and to the safety of other detainees, and in avoiding burdensome and unnecessary litigation. All of these interests would be damaged if Mr. Glushchenko is allowed to dehydrate or starve himself to death without intervention. Given the potentially dire consequences if the motion is not granted, the balance of harms and the public interest weigh substantially in favor of granting the requested relief.

## CONCLUSION

An emergency order is necessary to preserve the status quo and to prevent irreparable harm to Mr. Glushchenko's life and health. Absent a temporary order permitting the United States to perform involuntary medical examinations of Mr. Glushchenko, to administer involuntary hydration to Mr. Glushchenko, and to restrain him if he resists those examination or hydration efforts, Mr. Glushchenko may be permanently injured or die.

The United States respectfully asks the Court to issue a temporary order permitting the Secretary of DHS, through component agencies ICE and IHSC, to:

1. conduct involuntary blood draws and weight checks, insert urinary catheters, and perform routine medical examinations on Mr. Glushchenko;

2. administer involuntary hydration to Mr. Glushchenko; and

3. restrain Mr. Glushchenko if he resists efforts to draw blood, be weighed, have urinary catheters inserted, or have hydration administered.

1   The United States also requests that the Court set this matter for hearing as soon
2   as practicable so that it can determine the rights of Mr. Glushchenko.
3   Respectfully submitted this 10th day of July, 2019.

                MICHAEL BAILEY
                United States Attorney
                District of Arizona

                *s/ Bill C. Solomon*
                BILL C. SOLOMON
                Assistant U.S. Attorney
                *Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and mailed a copy of the foregoing First Class Mail addressed to the following CM/ECF non-registrants

**Eugenii Glushchenko** (Axxx xxx 460)
Eloy Detention Center
5501 N. La Palma Road
Eloy, AZ 85131
*Respondent*

*s/ Lauren M. Routen*
United States Attorney's Office

15