MICHAEL BAILEY
United States Attorney
District of Arizona
BILL C. SOLOMON
Assistant U.S. Attorney
State Bar No. 020012
KATHERINE R. BRANCH
Assistant U.S. Attorney
State Bar No. 025128
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4449
Telephone: (602) 514-7500
Facsimile: (602) 514-7693
E-Mail: William.Solomon@usdoj.gov
   Katherine.Branch@usdoj.gov

*Attorneys for the United States of America*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>   Petitioner,<br><br>v.<br><br>Eugenii Glushchenko,<br><br>   Respondent. | No. CV-19-04678-PHX-SPL (JFM)<br><br>**MEMORANDUM REGARDING INVOLUNTARY FEEDING OF IMMIGRATION DETAINEE** |

The United States hereby submits this memorandum regarding its interests in continuing to involuntarily feed Respondent, in compliance with this Court's order dated July 16, 2019 (Doc. 8).

**MEMORANDUM**

**I. Status and Background of Respondent's Immigration Proceedings**

Mr. Glushchenko is a native of the Union of Soviet Socialist Republics (USSR) and citizen of Russia, who was born in 1982 in the USSR. Ex. 1. On or about September 2, 2018, Mr. Glushchenko was found near mile marker 77 along State Route 85, near Lukeville, Arizona, after having entered the United States without inspection by an immigration officer by walking through the desert near Sonoyta, Mexico. Exs. 2, 3. On

or about September 21, 2018, the Department of Homeland Security (DHS) determined Mr. Glushchenko to be inadmissible pursuant to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA) as an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the INA. Ex. 4.

On October 9, 2018, DHS placed Mr. Glushchenko into removal proceedings under INA § 240 by issuing him a Notice to Appear (NTA), charging him as removable from the United States pursuant to INA § 212(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. Ex. 5. On January 18, 2019, an Immigration Judge at the Eloy Detention Center (EDC) sustained the charge of removability in the NTA. Exs. 5, 7. On that same date, the Immigration Judge construed Mr. Glushchenko's appeal to the Board as a request for custody redetermination, but took no action on the request in order to give Mr. Glushchenko time to gather evidence in support of his request for a bond and/or to obtain an attorney. Ex. 6.

## II. Weighing of Interests in Involuntarily Feeding Respondent

### A. Regulating Mr. Glushchenko's Hunger Strike by Involuntarily Monitoring, Hydrating, and Feeding Him Does Not Violate the First Amendment. [1]

"The First Amendment literally forbids the abridgment only of 'speech,'" but the Supreme Court has "long recognized that its protection does not end at the spoken or

---

[1] In the order dated July 16, 2019, this Court ordered the United States to explain how its interests in continuing to involuntarily feed Respondent outweigh vindication of Respondent's First and Fourteenth Amendment rights. *See* Doc. 8 at 2. The Fourteenth Amendment prohibits states from depriving any person of life, liberty without due process of law and from denying to any person within their jurisdictions the equal protection of the laws. Although the Bill of Rights, including the First Amendment, originally applied only to the Federal Government, the Supreme Court has now applied many of those rights against the states through the Due Process Clause of the Fourteenth Amendment. *See, e.g., McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Because this case does not involve state action, but only action by the Federal Government, the Fourteenth Amendment is not implicated here. The United States, therefore, will address only the First Amendment interests this case may implicate.

written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The Supreme Court has, however, rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *U.S. v. O'brien*, 391 U.S. 367, 376 (1968).

While "a hunger strike may be protected by the First Amendment if it was intended to convey a particular message," *Stefanoff v. Hays Cty., Tex.*, 154 F.3d 523, 527 (5th Cir. 1998), in deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, the Supreme Court has "asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404 (internal quotation and punctuation marks, and citation, omitted).

In contrast to many of the cases in which the Supreme Court has recognized the expressive nature of conduct under the First Amendment, Mr. Glushchenko's hunger strike does not appear to be intended to convey any particular message. *See Tinker v. Des Moines Indep. Cmty. School Dist.*, 393 U.S. 503, 505 (1969) (recognizing the expressive nature of students' wearing of black armbands to protest American military involvement in Vietnam); *Brown v. Lousiana*, 383 U.S. 131, 141-42 (1966) (recognizing the expressive conduct of a sit-in by blacks in a "whites only" area to protest segregation); *Schacht v. United States*, 398 U.S. 58 (recognizing as expressive conduct the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam); *Spence v. Washington*, 418 U.S. 405, 409-10 (finding that attaching a peace sign to the flag is expressive conduct); and *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943) (recognizing that a refusal to salute the flag was expressive conduct). Instead, Mr. Glushchenko has alternatively told Enforcement and Removal Operations officials that "he was not eating because he was not hungry, or that he will not eat until he is released from detention." Decl. of Jason Ciliberti at ¶ 7 (Doc. 1-3). Thus, unlike the long line of cases in which the Supreme has found conduct to be expressive and, therefore, constitutionally protected, no intent to convey a particularized message is evident in Mr.

Glushchenko's hunger strike. Moreover, even if there was some intent to convey a particularized message, there is no great likelihood that the message would be understood by those who viewed it. *See Johnson*, 491 U.S. at 404. For these reasons, Mr. Glushchenko's hunger strike does not constitute expressive conduct protected by the First Amendment.

Although it appears Mr. Glushchenko's hunger strike is not intended to convey any particular message, his conduct clearly involves the "nonspeech" element of refusing to take in hydration or nourishment. Even assuming for the sake of argument that his hunger strike is intended to convey a particular message, the Supreme Court has held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment Freedoms." *O'brien*, 391 U.S. at 376. "[A] government regulation is sufficiently justified if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest." *Id*. at 377.

Here, the regulation of Mr. Glushchenko's hunger strike by involuntarily monitoring, hydrating, and feeding him is sufficiently justified because it furthers the important and substantial interest of preserving the health and life of an immigration detainee, Mr. Glushchenko. Doc. 1-3, Ciliberti Decl. at ¶¶ 17(a), 17(i). Furthermore, preserving Mr. Glushchenko's health and life by involuntarily monitoring, hydrating, and feeding him maintains the security and discipline of the Eloy Detention Center (EDC). *Id.* at ¶¶ 17(a), 17(c), 17(d)-(f). Moreover, not only are these governmental interests unrelated to the suppression of free speech, but any incidental restriction they may impose on free speech is no greater than essential to further these important interests. Thus, the governmental interests in regulating the nonspeech element of Mr. Glushchenko's hunger strike fully justify any incidental limitations on his First Amendment Freedoms. *See O'brien*, 391 U.S. at 376.

## B. Involuntarily Feeding Mr. Glushchenko Based on a Medical Emergency Does Not Violate His Constitutional Rights.

The majority of courts to have considered the question of force-feeding, even in cases where detainees were not involved in criminal conduct, have held that an order authorizing force-feeding based on a medical emergency does not violate a hunger-striking prisoner's constitutional rights. *Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 171-72 (2nd Cir. 1998). In addition, "the overwhelming majority of courts have concluded … that absent exceptional circumstances prison officials may force-feed a starving inmate actually facing the risk of death." *Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014). Moreover, "[t]he mere allegation of force-feeding does not describe a constitutional violation." *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992).

In *Aamer*, 742 F.3d at 1026-27, 1043, three nonresident-alien detainees who, remained in custody despite having been cleared for release, brought suit in connection with their non-court-ordered force-feeding, or threat of force-feeding, while detained at the Guantanamo Bay Naval Station. They claimed "that the government's force-feeding of hunger-striking detainees violate[d] their constitutionally protected liberty interest– specifically, the right to be free from unwanted medical treatment…." *Id*. at 1038. The court assumed, without deciding, that the constitutional right to be free from unwanted medical treatment extends to nonresident aliens detained at Guantanamo and that it should use the *Turner* framework to evaluate the petitioners' claims. *Id*. at 1039.

"In *Turner*, the Supreme Court set forth the general test for assessing the legality of a prison regulation that 'impinges on' an inmate's constitutional rights, holding that such a regulation is 'valid if it is reasonably related to legitimate penological interests.'" *Id*. at 1039 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "The very premise of *Turner* is that a prison regulation that impinges on inmates' constitutional rights may nonetheless be valid." *Id*. (internal quotation marks and citation omitted). In other words, "although prison walls do not form a barrier separating prison inmates from the protections of the Constitution, they do substantially change the nature and scope of those constitutional

protections, as well as the degree of scrutiny that courts will employ in assessing alleged violations." *Id*. (Internal quotation marks and citation omitted).

In *Aamer*, the government identified two penological interests at stake, "preserving the lives of those in its custody and maintaining the security and discipline in the detention facility." *Id*. at 1040. The D.C. Circuit acknowledged that "many courts have concluded that such interests are legitimate and justify prison officials' force-feeding of hunger-striking inmates." *Id*. (discussing numerous cases in which courts have found preservation of life of those in custody and maintaining security and discipline in the detention facility legitimate interests that justify force-feeding).

The Department of Homeland Security (DHS), U.S Immigration and Customs Enforcement (ICE), has expressed penological interests in this case that are nearly identical to the interests expressed in *Aamer*. First, and foremost, ICE is obligated to maintain the safety and security of the ICE detainees housed at the EDC and provide for the health and well-being of the detainees. Doc. 1-3, Ciliberti Decl. at ¶ 17(a). Included in that obligation is the responsibility to ensure appropriate medical care to detainees and to act to preserve and protect detainees' lives while they are detained at the EDC. *Id*. at ¶ 17(i). Allowing a detainee to cause his own death without staff intervention would completely undermine DHS's obligation to render appropriate medical care and prevent detainee suicides. *Id*. at ¶ 17(c).

If other detainees were to become aware of a hunger-striker's death due to inaction by EDC staff, those detainees may lose confidence in the skills, abilities, or willingness of EDC staff to administer medical care. *Id*. at ¶ 17(d). Those detainees may become reluctant to seek treatment from EDC medical staff, reluctant to accept recommended treatments, and may decide there is a need to second-guess the judgments of medical staff. *Id*. They may simply refrain from seeking treatment for their illnesses, leading to emergency situations that could have been avoided had the detainee sought medical help at an earlier time. *Id*.

If ICE were simply to allow Mr. Glushchenko to die, without intervening to save

6

him, it is quite possible that security and discipline at the EDC could be adversely affected. Other EDC detainees could act alone or in groups to disrupt operation of the EDC by engaging in hunger strikes or in other disruptive or violent acts directed at staff to express detainee anger, resentment, and frustration. *Id*. at ¶ 17(a). Other detainees may also engage in hunger strikes to attempt to manipulate staff to gain various benefits and privileges. *Id*. at ¶ 17(f). Without the ability to intervene when medically necessary, the EDC will be forced to choose between letting a detainee die or giving in to his wishes. *Id*.

As noted in the United States' Status Report (Doc. 7), on July 12, 2019, medical personnel determined that it was necessary to involuntarily feed Mr. Glushchenko, but he was able to dislodge the nasogastric tube on both attempts. Since then, Mr. Glushchenko has largely voluntarily consumed the nutritional supplement after much coaxing by medical staff, but on two occasions, Mr. Glushchenko refused to voluntarily consume the supplement, relenting only after the security team was assembled to place the nasogastric tube. Doc. 7-1, Decl. of Dale Welsch, PA-C at ¶¶ 8, 9. Mr. Glushchenko continues to refuse to be weighed, is unable to walk, and is severely emaciated. Ex. 8, Decl. of Dale Welsh, PA-C, dated July 18, 2019, at ¶ 10. His lab work remains abnormal.

### III. Conclusion

The regulation of Mr. Glushchenko's hunger strike by involuntarily feeding him is valid because it is reasonably related to the penological interests at stake here, namely, the preservation of Mr. Glushchenko's health and life, and the maintenance of security and discipline at the EDC. Even if involuntarily feeding Mr. Glushchenko impinges upon his constitutional rights, which DHS does not concede, DHS's interests in preserving Mr. Glushchenko's health and life and in maintaining security and discipline at the EDC justify regulating Mr. Glushchenko's hunger strike by involuntary feeding him as medically necessary.

///

///

///

1 | Respectfully submitted the 18th day of July, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/Bill C. Solomon*
BILL C. SOLOMON
KATHERINE R. BRANCH
Assistant U.S. Attorneys
*Attorneys for the United States of America*

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**Christopher D. Thomas**
**Kristine J. Beaudoin**
PERKINS COIE, LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ 85012-2788
Tel: (602) 351-8000
Fax: (602) 648-7000
Email: CThomas@perkinscoie.com
KBeaudoin@perkinscoie.com
DocketPHX@perkinscoie.com
*Attorneys for Respondent*


*s/ Lauren M. Routen*
United States Attorney's Office