Christopher D. Thomas (Bar No. 010482)
Kristine J. Beaudoin (Bar No. 034853)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
Email: CThomas@perkinscoie.com
KBeaudoin@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Respondent Eugenii Glushchenko*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Petitioner,<br><br>v.<br><br>Eugenii Glushchenko,<br><br>Respondent. | No. 2:19-cv-04678-PHX-SPL (JFM)<br><br>**OPPOSITION TO PETITIONER'S MOTION FOR EMERGENCY TEMPORARY ORDER TO PERFORM INVOLUNTARY MEDICAL EXAMINATIONS AND ADMINISTER INVOLUNTARY HYDRATION** |

Respondent Eugenii Glushchenko is a 37-year-old husband and father who fled Russia with his then-pregnant wife after repeated government death threats. Mr. Glushchenko was originally targeted because of his work with western charities and his refusal to pay bribes to the FSB. Despite several attempts to move and hide, Mr. Glushchenko and his wife were forced to fly to Mexico after receiving a final warning.

Ultimately, Mr. Glushchenko and his wife flagged down a border patrol officer on the U.S. side of the border, where his wife was taken to the hospital for treatment. Mr. Glushchenko has remained in custody. His wife, who upon information and belief has legal status, and his U.S.-born son have been released.

Mr. Glushchenko's pattern of erratic and limited eating is not the result of a death wish, but rather the consequence of the government's failure to return to him his medical records and provide for appropriate care. Mr. Glushchenko has previously diagnosed medical conditions that he believes are currently affecting his appetite and ability to eat and

drink, and while he had medical records with him at the time he was detained, he has not been provided access to those records. Eating and drinking are extremely painful for him, as is the forced insertion of a feeding tube through his nose, which has been broken multiple times. The solution to this situation is not, as the government demands, for Mr. Glushchenko to be enjoined to allow painful force feeding in perpetuity. Rather, it is for the government to provide Mr. Glushchenko with his past medical records and arrange for appropriate medical care to determine the cause of his underlying condition.

There is accordingly no basis for the government's demand that the Court violate Mr. Glushchenko's bodily integrity in order to end his hunger strike, which is constitutionally protected expressive conduct.

### I. EUGENII'S OBJECTION TO FORCED FEEDING IS A SUBSTANTIVE DUE PROCESS RIGHT.

As an immigrant, Mr. Glushchenko enjoys all of the protections of the Bill of Rights that are not expressly limited to citizens, including the First, Fifth, and Fourteenth Amendments. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (First Amendment); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1109 (9th Cir. 2001) (Fifth and Fourteenth Amendments).

Mr. Glushchenko enjoys a substantive due process right not to be forcibly fed through a nasogastric tube—even putting aside the government's inappropriate refusal to provide him with proper medical care. The Supreme Court has repeatedly held that competent persons have a due process right to refuse unwanted medical treatment. *See e.g.*, *Cruzan by Cruzan v. Dir., Miss. Dep't of Health*, 497 U.S. 261, 270, 281 (1990) ("[T]he Due Process Clause protects an interest in . . . refusing life-sustaining medical treatment[.]"); *Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Everyone, regardless of physical condition, is entitled, if competent, to refuse unwanted lifesaving medical treatment."); *Washington v. Glucksberg*, 521 U.S. 702, 725 (1997) (recognizing America's "long legal tradition protecting the decision to refuse unwanted medical treatment"). Notably, the government has not asserted that Mr. Glushchenko is incompetent or otherwise unable to decide to voluntarily refuse painful procedures. Indeed, the government's witness, Dale

1 Welsh, has declared on multiple occasions that Mr. Glushchenko has been counseled on the
2 potential ramifications of not eating numerous times, that he does not have any known
3 psychiatric condition that would cause him not to eat, and that he is "alert and oriented to
4 person, time and place." *See* Doc. 1-2 at 2 ¶¶ 7, 9, 10, 13.

## II. *YOUNGBERG,* NOT *TURNER,* IS THE CORRECT TEST FOR DETERMINING WHETHER THE GOVERNMENT MAY FORCE-FEED MR. GLUSHCHENKO.

### A. *Turner* Is Not the Correct Test for Civil Detainees.

In this case, the government seeks an order to forcibly end Mr. Glushchenko's hunger strike by performing medical procedures on him against his will (including insertion of a nasogastric tube and the use of restraints to facilitate these forced procedures, which Mr. Glushchenko has received and dislodged at least twice). Doc. 7-1 at 2 ¶ 7. The government contends that *Turner v. Safley*, 482 U.S. 78 (1987), provides the framework for analyzing this sweeping request because *Turner* is "[t]he proper standard for determining the validity of a *prison* regulation or procedure claimed to infringe on an *inmate's* constitutional rights." Doc. 2 at 8 (emphasis added). However, Mr. Glushchenko is not a prison inmate serving a criminal sentence. Rather, he is in the custody of ICE to effectuate his removal pursuant to civil enforcement processes. Accordingly, *Turner* is wholly inapplicable.

Over the course of more than a century, the Supreme Court has consistently held that immigration proceedings—including detention—are civil rather than criminal proceedings. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (stating that immigration proceedings "are civil, not criminal"); *Wong Wing v. United States*, 163 U.S. 228, 237-38 (1896) (as civil detainees, those detained pending deportation could not be forced into hard labor). The Supreme Court has, logically, ruled that civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).

Employing the *Turner* test to the constitutional rights of civil detainees would violate the Court's careful distinction between civil detainees and those serving criminal sentences.

*See Turner*, 482 U.S. at 89. The Supreme Court has stated that an "important function of the corrections system is the deterrence of crime," carried out by keeping prisoners "isolated from the rest of society" and "work[ing] to correct the offender's demonstrated criminal proclivity." *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). It is "in the light of these legitimate penal objectives that a court must assess challenges to prison regulations based on asserted constitutional rights of prisoners." *Id*. at 823. In contrast, the government has no cognizable interest in using civil detention to deter crime, correct "criminal proclivity," or punish wrongdoing. *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (warning against making civil commitment a "mechanism for retribution or general deterrence"); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188-89 (D.D.C. 2015) (granting preliminary injunction against policy of using general deterrence as a justification to detain immigrants).

In *Jones v. Blanas*, the Ninth Circuit held that civil detainees are entitled to better conditions even than pretrial criminal detainees, who in turn are entitled to better conditions than convicted prisoners. 393 F.3d 918, 932 (9th Cir. 2004). Specifically, the court distinguished between civil and criminal confinement by holding that a person "detained under civil—rather than criminal—process . . . is entitled to 'more considerate treatment' than his criminally detained counterparts." *Id.* (quoting *Youngberg*, 457 U.S. at 321–22); *see also Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *4 (D. Ariz. Nov. 18, 2016), *clarified on denial of reconsideration*, No. CV-15-00250-TUC-DCB, 2017 WL 467238 (D. Ariz. Jan. 3, 2017) (applying *Jones* to immigration detainees). In *Jones*, a civil detainee being held in a county jail, under the same conditions as people held in both pretrial and sentenced criminal custody, objected to this treatment as punitive and inconsistent with the civil nature of his confinement. *Jones*, 393 F.3d at 923. The Ninth Circuit concluded that "a presumption arises that Jones's year-long confinement in the general criminal population of the jail was punitive," and that unless the government rebutted this presumption, these conditions violated his substantive due process rights. *Id*. at 934.

The government may argue that because ICE has chosen to house its civil detainees in a jail, their rights should be downgraded to reflect the setting. However, *Jones* makes clear that its protections are based on the civil status of civil detainees, not the location of their confinement or even the detainee's prior criminal history. *See Jones*, 393 F.3d at 933 ("Civil status means civil status, with all the Fourteenth Amendment rights that accompany it."); *see also Lynch v. Baxley*, 744 F.2d 1452, 1463 (11th Cir. 1984) (prohibiting Alabama emergency civil detainees from being held in jails altogether because conditions of confinement were unacceptable).

For all of these reasons, and particularly in light of the Ninth Circuit's consistent application of *Jones* to civil detainees, applying *Turner* to determine a civil detainee's constitutional rights is clearly irreconcilable with *Jones*. Instead of applying *Turner*, the Court should be guided by case law on medication refusals from other civil detention contexts and from non-detention contexts. This would provide appropriate protections for the fundamental rights at stake in this case.

**B.** ***Youngberg v. Romeo* Provides the Correct Framework for Evaluating Forced Medical Interventions on a Civil Detainee.**

To the extent the government is justifying force-feeding as a medical intervention, *Youngberg v. Romeo* provides the relevant framework. In *Youngberg*, the Supreme Court addressed the question of how to evaluate a civilly-committed individual's liberty interests in safety and freedom from bodily restraint against the government's interest in protecting both the respondent and those around him. 457 U.S. at 319–20. Romeo was an individual with severe mental disabilities who was civilly committed because his mother was "unable to care for him or control his violence." Inside the facility, he suffered frequent injuries (both from his own violence and from others) and was frequently kept in restraints for the protection of himself and other residents. *Id.* at 309–10. The court held that "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 321. Ultimately, the court concluded that while medical judgment "exercised by a qualified professional" carries a

1  presumption of validity, a civil detainee's rights would be violated if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. The *Youngberg* test has been applied to civil detainees in a range of circumstances. *See, e.g.*, *Ammons v. Wash. Dep't of Social & Health Servs.*, 648 F.3d 1020, 1027–29 (9th Cir. 2011) (unsafe conditions, specifically sexual abuse, in state-run mental institution); *Thomas S. v. Flaherty*, 902 F.2d 250, 252 (4th Cir. 1990) (conditions for mentally challenged adults in public psychiatric hospitals); *Clark v. Cohen*, 794 F.2d 79, 87 (3d Cir. 1986) (unnecessarily long civil commitment without community-living training). The same standard applies here to the government's request to force-monitor and force-feed Mr. Glushchenko, a civil immigration detainee. The government relies on four declarations—two from Jason Ciliberti, an ICE official with no medical expertise, and two from Dale Welsh, a physician assistant—to support its medical arguments in favor of force-feeding. For the reasons set forth below, neither is sufficient to justify force-feeding Mr. Glushchenko under the *Youngberg* standard.

### 1.  Lay Hearsay Testimony by a Non-Qualified Non-Professional Should Not Benefit from a Presumption of Validity.

Under *Youngberg*, only the judgments of a qualified "professional" merit deference. A professional is a "person competent, whether by education, training or experience, to make the particular decision at issue." *Youngberg*, 457 U.S. at 322 n.30. Long-term medical treatment decisions "normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded." *Id*.

Judged by this standard, Mr. Ciliberti is not a professional qualified to make judgments about medical care. Nothing in his declaration provides a foundation for him to offer medical expert testimony. He provides no CV, describes no relevant education, degrees, or other qualifications, and offers nothing to establish he has any special expertise. *See* Doc. 1-3 at 1 ¶¶ 1–2. He merely makes hearsay characterizations of unidentified

"administrative records," *see id.* at 1 ¶ 2 (citing "review of administrative records"), and hearsay characterizations of what unidentified "[m]edical [s]taff" have told him at unspecified times under unspecified circumstances, *see id.* at 4 ¶ 16. Accordingly, his opinions and speculations regarding medical care issues and the potential medical consequences of Mr. Glushchenko's hunger strike lack foundation and should either be stricken or accorded no weight.

        **2.    Medical Testimony That Recommends Force-Feeding a Competent Adult Fails the *Youngberg* Test Because It Is a Substantial Departure from Accepted Medical Professional Judgment, Practice, or Standards.**

Nor can the two declarations of the government's physician assistant be read to justify forced feeding consistent with *Youngberg*. Any medical opinion in favor of force-feeding a competent adult would "substantially depart[] from accepted professional judgment, practice or standards," *see Youngberg*, 457 U.S. at 323, because it would fail to take into account generally accepted medical ethics addressing hunger strikers and forced medical interventions, as well as standards of medical practice including those outlined in the ICE Performance-Based National Detention Standards (PBNDS). ICE detention standards clearly state that individuals in ICE custody have the right to make their own medical decisions, including the right to refuse medical treatment. 2011 PBNDS § 4.2(V)(E) (as revised in 2016), *available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

More broadly, force-feeding is condemned by national and international medical authorities. *See* WMA, DECLARATION OF MALTA ON HUNGER STRIKERS, *Guidelines for the Management of Hunger Strikers* ¶ 23 (Nov. 1991) (revised Oct. 2006) ("Forcible feeding is never ethically acceptable."), *available at* https://www.wma.net/policies-post/wma-declaration-of-malta-on-hunger-strikers. More specifically, medical experts have spoken out against force feeding in cases where an individual is competent to make his or her own decisions about their medical care. *See* Letter from AMA, to U.S. Sec'y of Defense Chuck Hagel (Apr. 25, 2013) ("Where a prisoner refuses nourishment and is considered by the

physician as capable of forming an unimpaired and rational judgment concerning the consequences of such a voluntary refusal of nourishment, he or she shall not be fed artificially."), *available at* https://www.documentcloud.org/documents/694196-hunger-strikers-letter-04-25-13.html; ICRC, *Hunger strikes in prisons: The ICRC's position* (Jan. 31, 2013) ("The ICRC [International Committee of the Red Cross] is opposed to forced feeding or forced treatment; it is essential that the detainees' choices be respected and their human dignity preserved."), *available at* http://www.icrc.org/eng/resources/documents/faq/hunger-strike-icrc-position.htm.

Accordingly, a medical recommendation in favor of force-feeding a competent adult would not be entitled to a presumption of validity under *Youngberg*. *See Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246 (2d Cir. 1984) (upholding the district court's finding that a school failed to guarantee the right of intellectually disabled students to safe conditions, after noting that conditions are unconstitutional where they "deviate from the 'professional judgment' standard"); *McCartney v. Barg*, 643 F. Supp. 1181, 1188 (N.D. Ohio 1986) (concluding that plaintiff with an intellectual disability housed in a state institution stated a claim under *Youngberg* where she made specific allegations that the "defendants based [treatment] decisions on administrative convenience at the expense of plaintiff's well-being" and the court found it "difficult to imagine that these actions would arise out of the exercise of considered professional judgment").

      **a.    The Alleged Security Interests Asserted by the Government Are Not Credible, Lack a Foundation, and Are Insubstantial.**

In addition to medical arguments, the government relies on Mr. Ciliberti to provide various arguments for force-feeding Mr. Glushchenko that can generally be characterized as security and administrative convenience arguments. For example, Mr. Ciliberti asserts that not force-feeding Mr. Glushchenko could lead to negative detainee perceptions of ICE staff that would in turn lead to "detainee violence and disruption," further hunger strikes, refusals to seek medical treatment, diversion of staff attention and resources, and negative

perceptions of ICE in the community. Doc 1-3 at 3–4 ¶ 17(a). These predictions are speculative and lack a foundation.

As stated above, Mr. Ciliberti offers nothing that would make these statements rise above the level of lay opinion. Additionally, even if he were to provide live testimony that would bring him over the *Daubert* line with respect to some relevant areas of expertise, these opinions are so unfounded that they would fail to justify the challenged practices even under *Turner*. Accordingly, they must also fail under the *Jones* standard. *See Jones*, 393 F.3d at 932 ("[W]hen a [civil] detainee is confined in conditions identical to, similar to, or more restrictive than, those in which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" (internal citation omitted)).

More fundamentally, Mr. Ciliberti's non-medical predictions are not entitled to deference precisely because they are non-medical in nature. In *Sharp v. Weston*, the Ninth Circuit addressed, *inter alia*, routine strip searches and other prison-like practices in a civil commitment facility for "sexually violent predators" who were civilly detained after completing their criminal sentences. *Sharp v. Weston*, 233 F.3d 1166, 1169–71 (9th Cir. 2000). The Ninth Circuit held that the district court properly refused to defer to the facility administrators' decisions to maintain these practices because they were adopted not to further the specific purpose of the facility (namely, treatment of sexually violent predators), but rather because they matched the Department of Corrections' policies. *Id*. at 1172 & n.3.

In the absence of such deference, the Ninth Circuit simply boils *Youngberg* down to its essential command of balancing one set of interests against the other. *See Youngberg*, 457 U.S. at 321 ("[W]hether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests."); *see also Mills v. Rogers*, 457 U.S. 291, 299 (1982) (in related context of forcible medication of mental patients, citing *Youngberg* and balancing constitutional interest against state interest). In *Oregon Advocacy Center v. Mink*, the Ninth Circuit confronted a challenge to the extended detention of incapacitated criminal defendants in county jails while awaiting evaluation and efforts to restore them to competency. 322 F.3d 1101, 1121–23 (9th Cir.

2003). To decide the case, the Ninth Circuit directly balanced the criminal defendants' liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state. *Id.* This balancing falls firmly on the side of Mr. Glushchenko. To force feed Mr. Glushchenko would severely invade his right to bodily integrity—a fundamental right.

Meanwhile, almost all of Mr. Ciliberti's speculative bad outcomes pale in importance compared to this fundamental right. A governmental interest in maintaining a positive "perception of ICE and its staff" in the community cannot be secured at the expense of the fundamental rights of individuals. *Cf.* Doc. 1-3 at 3 ¶ 17(h). Nor can fundamental rights of individuals be violated because respecting those rights could lead to events that "draw[] staff attention away from other detainees," *id.* at ¶ 17(g), require greater monetary expenditures on other people, *id.* at ¶ 17(e), encourage other hunger strikes or make the government lose leverage in negotiations with future hunger strikers, *id.* at ¶ 17(c) & (f), or suffer a "drain on staff time and resources and distract staff" due to possible future litigation, *id.* at 4 ¶ 17(i). This is particularly in true in light of the fact that Mr. Glushchenko is not on a "hunger strike" in protest—he is simply seeking appropriate medical care to treat the underlying issues making eating and drinking so difficult for him.

Even assuming that Mr. Glushchenko's lack of appetite and unwillingness to eat can fairly be characterized as a "hunger strike," the only predictions by Mr. Ciliberti that could, if credible, potentially compete with Mr. Glushchenko's fundamental right are that failing to force-feed Mr. Glushchenko could lead to violent disruptions within the facility. *See id.* at 3 ¶ 17(a) & (b). However, the chain of events that Mr. Ciliberti describes is, at best, exactly the kind of speculative, poorly- founded fear of disturbance that triggers extreme skepticism from courts in a wide range of contexts. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969) ("[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."). It begins with Mr. Ciliberti's statement that if Mr. Glushchenko dies during his hunger strike, "[p]erceptions *may* be formed by the ICE detained population that ICE will simply let

Mr. Glushchenko die, without intervening to save him." Doc. 1-3 at 3 ¶ 17(a) (emphasis added). He provides no basis for his assumption that such perceptions would be formed by this population, nor does he provide any guidance regarding the relative likelihood of this event.[1] If anything, ICE's refusal to speak to Mr. Glushchenko about his critical medical history and order tests to understand the underlying cause of his medical issues is more likely to create the perception that ICE "let Mr. Glushchenko die." But this is not the only unfounded assumption Mr. Ciliberti makes.

If perceptions are formed that ICE simply "let Mr. Glushchenko die," Mr. Ciliberti then posits that "[t]he detained population, having formed such a perception, *could* act alone or in groups to disrupt the operation of the EDC." *Id.* at ¶ 17(a) (emphasis added). He does not offer an opinion regarding the likelihood that these perceptions would lead to disruptive activities, rather than completely legitimate methods of expressing frustration, such as complaints or petitions to ICE or facility administrators. Nor does he explain what he means by "disruption." In other words, the most substantial justification that Mr. Ciliberti can offer for forcibly invading Mr. Glushchenko's right to bodily integrity is a wholly speculative, unfounded chain of events, each of which may or may not come to pass, and which may not even lead to any serious consequences in the end. That is insufficient.

### III. EVEN IF THE *TURNER* TEST APPLIED TO CIVIL DETAINEES LIKE MR. GLUSHCHENKO, THERE WOULD BE NO BASIS FOR ORDERING HIM SUBJECT TO FORCE-FEEDING.

Even if, as the government contends, *Turner* applies to this case, there is no basis for the Court to order that Mr. Glushchenko be force-fed under the current circumstances. Even where it applies, *Turner* requires that the government meet the burden of persuasion with regard to four factors, at least three of which require rejection of the government's demand for immediate authorization of force-feeding. The *Turner* factors are: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate

---

[1] The formation of such perceptions, if any, would be fueled by ICE's own characterization of Mr. Glushchenko's failure to eat as a "hunger strike," since Mr. Glushchenko very much wants to live and be healthy, and seeks appropriate medical treatment that would allow him to do so.

governmental interest put forward to justify it," (2) whether "there are alternative means of exercising the right that remain open to prison inmates," (3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the "absence of ready alternatives" to the challenged policy. As to the fourth factor, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S at 89–91. The government fails to establish the first, third, and fourth factors.

The government's initial Motion for Temporary Restraining Order asked for an order allowing the United States to "perform involuntary medical examinations," "to restrain [Mr. Glushchenko] if he resists those examinations, and to administer hydration to Respondent Eugenii Glushchenko if necessary to preserve his life." Doc. 1 at 1. At the time of the filing, Mr. Glushchenko was not only declining to eat, but also declining to drink water and refusing to allow medical staff to conduct medical monitoring. *See generally* Doc. 1-2. This state of affairs caused Mr. Welsh to opine in his initial declaration dated July 10 that Mr. Glushchenko had "reached a point where he will require immediate medical intervention to prevent further deterioration and serious medical complications." Doc 1-2 at 4 ¶ 14.

Subsequently, Mr. Glushchenko has had further consultations with Mr. Welsh, and has voluntarily accepted recommendations from Mr. Welsh. Mr. Glushchenko has begun taking hydration and in the last two days has consumed multiple bottles of nutrients. Doc 7-1 at 2–3 ¶¶ 8–11. Mr. Glushchenko's rehydration has eliminated the need for "immediate medical intervention" about which Mr. Welsh expressed concern originally. Doc. 1-2 at 4 ¶ 13. Indeed, Mr. Welsh's supplemental declaration recognizes that at this point, an involuntary treatment order is only necessary "to provide the necessary incentive for Mr. Glushchenko to consume nutrition." Doc. 7-1 at 3 ¶ 11.

Ultimately, the government interests here do not outweigh Mr. Glushchenko's constitutional rights. As discussed above, the government's evidence that accommodating Mr. Glushchenko's rights would lead to security risks or disruption consists entirely of a four-page declaration signed by ICE official Jason Ciliberti, which goes through a parade of horribles describing what "may" or "could" happen if Mr. Glushchenko's condition substantially worsens and he dies as a result of his hunger strike. *See* Doc. 1-3 at 3–4 ¶ 17. The *Turner* standard is deferential, but "not toothless." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). "Although prison officials may pass regulations in anticipation of security problems, they must at a minimum supply some evidence that such potential problems are real, not imagined." *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 882 (9th Cir. 2002). Prison officials may not "pil[e] conjecture upon conjecture" to justify their policies. *Reed v. Faulkner*, 842 F.2d 960, 963-64 (7th Cir. 1988). To show a likelihood of success on the merits, the government must provide actual evidence, not imaginative conjectures.

There is a readily available alternative here: ICE could simply provide the necessary medical testing required to determine what Mr. Glushchenko's underlying condition is. But alternatively, ICE's detention policies, embodied in the 2011 PBNDS, also provide a readily available, less intrusive alternative to force-feeding Mr. Glushchenko if his medical condition becomes imminently life-threatening. *See* 2011 PBNDS § 4.7 (Terminal Illness, Advance Directives, and Death).[2] Under the 2011 PBNDS, when a detainee's medical condition "becomes life-threatening," officials are directed to "[a]rrange the transfer of the detainee to an appropriate off-site medical or community facility if appropriate and medically necessary." *Id.* § 4.7(V)(A). Upon transfer to a community hospital, the hospital assumes medical decision-making authority, and "the hospital's internal rules and procedures concerning seriously ill, injured and dying patients shall apply to detainees." *Id*.

---

[2] The 2008 PBNDS (which may apply to Eloy) contain parallel provisions that are essentially indistinguishable from the 2011 PBNDS provisions discussed here. *See* 2008 PBNDS, *Terminal Illness, Advance Directives, and Death* (Dec. 2, 2008), https://www.ice.gov/doclib/dro/detentionstandards/pdf/terminal_illness_advance_directives_and_death.pdf.

In other words, if the hospital's internal rules and procedures conform to standard medical ethical rules by prohibiting force-feeding of competent adult patients, then a hospitalized hunger striker will receive care consistent with those policies. It is not clear why ICE would object to adhering to its own policies and permitting the community hospital to provide care consistent with its own procedures, particularly when ICE has already demonstrating a willingness to seek treatment for Mr. Glushchenko from two community hospitals. Doc. 1-2 at 2 ¶ 8.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the government's request to authorize forced feeding of Mr. Glushchenko.

Dated: July 18, 2019                 **PERKINS COIE LLP**

By: s/ Kristine J. Beaudoin
    Christopher D. Thomas
    Kristine J. Beaudoin
    2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788

*Attorneys for Respondent Eugenii Glushchenko*

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on July 18, 2019, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Bill C. Solomon
William.Solomon@usdoj.gov

Katherine Branch
Katherine.Branch@usdoj.gov


          s/ D. Freouf